## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

NICOLE HOWCROFT,                            :
        Plaintiff,                      :
                             :
        v.                               :          C.A. No. 15-201S
                             :
CAROLYN W. COLVIN, ACTING                   :
COMMISSIONER OF SOCIAL SECURITY,            :
        Defendant.                      :

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

This administrative appeal focuses on the credibility of a disability claimant suffering from fibromyalgia and depression.  It is before the Court on Plaintiff Nicole Howcroft's motion for reversal of the decision of the Commissioner of Social Security (the "Commissioner"), denying Disability Insurance Benefits ("DIB") under 42 U.S.C. § 405(g) of the Social Security Act (the "Act") based on errors made by the administrative law judge ("ALJ") that taint his credibility finding.  Defendant Carolyn W. Colvin ("Defendant") has filed a motion for an order affirming the Commissioner's decision.  This matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  Having reviewed the entire record, I find that the ALJ's findings are sufficiently supported by substantial evidence and recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 13) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 14) be GRANTED.

**I.**      <u>**Background Facts**</u>

      **A.**      **Plaintiff's Background**

Plaintiff, a younger individual, was forty-one years old when she stopped working on January 6, 2013, her alleged onset-of-disability date. See Tr. 180. She had attended college for two years at the Community College of Rhode Island and received her medical assistant certification from the Sawyer School in 1994. Tr. 45, 346. She had been married and, as of the hearing date, had a sixteen-year-old son and a twenty-two year old daughter; for much of the relevant period, she lived in a house with her husband of many years, their two children, her daughter's child and briefly, her daughter's boyfriend. By the end of the relevant period, Plaintiff and her husband had separated and she was living alone with her son. Tr. 45, 49, 57, 347.

For the two years before she stopped work on January 6, 2013, Plaintiff had been employed at the Katharine Gibbs School as an instructor in the medical assistant program; for four years prior to that, she worked at the Sawyer School, first as an instructor and then as a site administrator. Tr. 46-47, 49, 71, 213, 224. After stopping work, she collected Rhode Island Temporary Disability Insurance ("TDI") and then unemployment benefits, which ended in February 2014. Tr. 48, 52. Shortly before the ALJ hearing in September 2014, Plaintiff accepted a part-time (four hours a week) position with the adult education section of the Cranston school department, a former employer, which had asked her to develop and then teach an educational program. Tr. 49, 53.

1.    Medical History – Fibromyalgia

Plaintiff was twenty-six when she was diagnosed by a rheumatologist with fibromyalgia. Tr. 332. After the diagnosis, she was treated initially by specialists, but by early 2012, a year before her alleged onset date, she was receiving fibromyalgia treatment from her primary care physician, Dr. Matthew Salisbury, who prescribed medication for pain, with increased doses,

2

including opiates, to address fibromyalgia flares.  Tr. 281-326, 334-41, 396-406.  According to her testimony, Plaintiff left her job as an instructor at the Katharine Gibbs School on a medical leave in early 2013 because "I was starting to get really sick at the time, and that's when I was pulled out of work by the doctor."  Tr. 47.  However, there is no record reference reflecting that any physician advised her to take a medical leave of absence; the only medical record for the period immediately preceding the date of onset is the note of her primary care physician, Dr. Matthew Salisbury, which focused largely on stress related to family conflict as a result of which Plaintiff was "feeling very overwhelmed emotionally" and had experienced a fibromyalgia flare. Tr. 295-96.  While Dr. Salisbury increased the dose of one medication to address the flare and made a referral for psychotherapy, there is no reference suggesting that he opined that Plaintiff needed a leave from work.  Tr. 295.

At Plaintiff's next appointment with Dr. Salisbury on January 23, 2013, his note confirms that she would be "OOW [out of work] for another month," that Plaintiff had "really clicked" with the therapist, that she was "looking forward to . . . going forward with her life," and that "[s]he has noted some trouble with flare of fibromyalgia pain."  Tr. 293.  On physical examination, Dr. Salisbury recorded no findings of any matters of concern and observed that she was "well developed well nourished and in no acute distress."  Tr. 293.  He scheduled a follow-up appointment in a month.  Tr. 293.

At the end of February 2013, Plaintiff had another fibromyalgia flare because she stopped taking one pain medication due to insurance issues; Dr. Salisbury noted that she "continue[s] OOW as she believes that she is not yet ready to return."  Tr. 291.  In March 2013, Plaintiff complained of arm and hand pain and Dr. Salisbury continued her medications, noting that she could use opiates for breakthrough.  Tr. 289.  At the same appointment, Dr. Salisbury noted that

he talked to her about "making a plan to resume work as she has been out for a long time." Tr. 289.  In May 2013, Plaintiff's pain flared after she wrenched her back and ankle while carrying laundry upstairs. Tr. 283.  Noting that the incident made the pain hard to control, Dr. Salisbury temporarily increased her opiate dose. Tr. 283.  In August 2013, when she experienced pain in her upper back due to whiplash from a motor vehicle accident, Dr. Salisbury made no change in medication dosage, but continued oxycodone on "very slow ongoing taper." Tr. 336.  In October 2013, Dr. Salisbury noted that Plaintiff was weaning down on opiates, taking a lower dose, "with overall good effect," and no significant "constipation or sedation." Tr. 338.  In December 2013, Plaintiff had another flare in her hands and arms; Dr. Salisbury referred her to a specialist but the record does not reflect that she followed up on this referral, apparently because of lack of money for the copay. Tr. 340, 405.  In early 2014, fibromyalgia pain flared again because Plaintiff had run out of medication three weeks prior; Dr. Salisbury increased the dose of one of her medications. Tr. 403.  In June 2014, Dr. Salisbury noted swelling of her hands and feet; he advised her to stop one medication and prescribed a new medication. Tr. 396.  As Plaintiff testified, this treatment got "rid of the swelling." Tr. 66.

At the hearing, Plaintiff testified about the efficaciousness of Dr. Salisbury's use of various medications for the treatment of fibromyalgia: "I think I'm finally on the right combination [of medication], because I was almost bedridden when I was diagnosed with it years ago.  It, kind of eases the pain and gets me up a little bit." Tr. 67.

>    2.    <u>Mental Health History – Depression</u>

In addition to long-standing fibromyalgia, Plaintiff had suffered from depression since childhood, although the record does not reflect treatment until 2012. Tr. 348.  She has no history

of inpatient psychiatric treatment.  Tr. 346.  During the period beginning one year prior to onset, Plaintiff received mental health treatment from four different sources.

The earliest record reflecting mental health treatment is from January 2012, when her primary care physician, Dr. Salisbury, prescribed anti-depressant medication.  Tr. 318.  In April 2012, he noted that "[f]ollow up/depression, feels better with new medicati[on]."  Tr. 308.  Even after he believed[1] she was treating with other mental health providers, Dr. Salisbury continued to monitor Plaintiff's mood and to prescribe certain mental health medications.  See, e.g., Tr. 281, 287, 401.  To the extent that he performed mental status examinations in the post-onset period, the results appear to be largely normal.  For example, on January 23, 2013, at an appointment just two weeks after the alleged onset of disability, he performed a neurological examination and recorded: "judgement and insite nl, memory nl. mood nl, no delusions or hallucinations.  No suicidal or homicidal ideations."  Tr. 293; see Tr. 291 (Feb. 26, 2013: same); Tr. 289 (Mar. 27, 2013: "some obvious psychomotor agitation is about at baseline, good eye contact , well kempt, no SI/HI at this time").

Plaintiff began treatment with the second mental health provider at the very end of 2012, when Dr. Salisbury referred Plaintiff to a psychologist, Dr. Danielle DeSantis, for therapy.  Tr. 295.  According to his note, the precipitant for the referral was "sign[ificant] stress because of issues at home (her daughter has a restraining order against the father of her baby and he is threatening violence), financial things (she is trying to sell her house), emotional issues (she and her husband have been arguing a great deal)."  Tr. 295-96.  While Plaintiff apparently saw Dr.

---

[1] As noted *infra*, apparently based on what Plaintiff told him, Dr. Salisbury believed Plaintiff was seeing Dr. DeSantis weekly from January 2013 through April 2014; other providers note that Plaintiff reported a much shorter treating relationship with Dr. DeSantis.  E.g., Tr. 410 ("stopped after approximately 6 sessions").  Similarly, Dr. Salisbury apparently was told that Plaintiff was treating with a "psychiatrist (Dr. Hickey);" in fact, Mr. Hickey is a nurse.  Tr. 285.

DeSantis, who submitted an opinion regarding Plaintiff's mental residual functional capacity ("RFC"),[2] the length, nature and intensity of the DeSantis therapy and whether Dr. DeSantis performed any testing or employed other clinical diagnostic techniques are all impossible to ascertain because Dr. DeSantis provided no treating records. Further, the record references to this therapy are inconsistent. On one hand, Dr. Salisbury noted "weekly" therapy with Dr. DeSantis starting in January 2013, resulting in "good progress," Tr. 285-93, and ending in April 2014, when Dr. Salisbury recorded that Plaintiff was "transitioning . . . away" from Dr. DeSantis. Tr. 401. By contrast, in March 2014, Plaintiff told a Butler Hospital physician, "that she began seeing a therapist about 8 months ago but stopped after approximately 6 sessions because she did not find it helpful." Tr. 410. And Nurse Hickey noted that Plaintiff was "no longer in therapy with Dr. DeSantis" on January 14, 2014. Tr. 342.

Plaintiff's third treating mental health provider is Brian Hickey, a nurse at West Bay Psychiatric Associates. She began to see him in May 2013, at the same time (according to Dr. Salisbury) that she was still treating with Dr. DeSantis. Tr. 281, 283, 285. Nurse Hickey's treating notes are in the record; they reflect a total of eight appointments from May 2013 until May 2014, all of which seem to be for medication prescriptions. Tr. 276-80, 342-44, 390-95. As Plaintiff explained to the ALJ, Nurse Hickey prescribed certain of her mental health medications, while Dr. Salisbury continued to prescribe others. Tr. 52. Nurse Hickey's notes are brief, difficult to read, reflect one significant gap in treatment and seem to contain only Plaintiff's subjective complaints. See, e.g., Tr. 342 ("hasn't been seen in four months"); Tr. 343 ("still crying a lot"). They do not appear to reflect any diagnostic techniques, mental status examinations, testing or treatment apart from medication. Oddly, Nurse Hickey seems to have

---

[2] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting." 20 C.F.R. § 404.1545(a)(1).

repeatedly been described by Plaintiff as a "psychiatrist" in her statements about him to other providers.  See, e.g., Tr. 285 ("She has seen (finally) a psychiatrist (Dr. Hickey)")), 346 ("She indicated a history of psychiatric services with Brian Hickey, M.D."), 384 ("Pt began seeing an outpatient psychiatrist about 8 months ago"), 405 ("She has followed with her psychiatrist who recently has change her abilify to wellbutrin"), 410 ("referred to [Butler] from her outpatient psychiatrist").  At the hearing, however, Plaintiff confirmed that she knows that he is a nurse. Tr. 51-52.

Plaintiff's fourth mental health provider is Butler Hospital.  Tr. 384-89.  She was admitted to the partial hospitalization program on March 21, 2014, because of "worsening symptoms of depression" due to chaos at home and a deteriorating relationship with her daughter.  Tr. 384, 410.  On mental status examination, Butler staff noted that Plaintiff reported feelings of "inadequacy/worthlessness, hopelessness," "sad/depressed, anxious, worried" mood and "depressed" affect, that she had difficulty with concentration, reading and watching television although she was able to attend to the interview, that she had normal memory and intellectual functioning with adequate insight and judgment and that she denied hallucinations. Tr. 385-86.  At intake, Butler assigned a Global Assessment of Function ("GAF")[3] score of 40, which reflects impairment in reality testing or communication; by the time she was discharged, her GAF was assessed at 50 (serious impairment), with a score of 60 (moderate symptoms) for

---

[3] The Global Assessment of Functioning ("GAF") scores relevant to this case are in the 51 – 60 range, which indicates "moderate difficulty in social, occupational, or school functioning," the 41 – 50 range, which indicates "serious impairment in social, occupational, or school functioning," and the 31-40 range, which indicates "[s]ome impairment in reality testing or communication."  See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR").  By the time GAF scores were assessed for Plaintiff in 2014, the most recent update of the DSM had eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'"  Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM–V")).  Nevertheless, adjudicators may continue to receive and consider GAF scores.  SSA Admin. Message 13066 at 2-6, available at http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=51489 (starting at p.19 of PDF document) (last visited May 28, 2016).

the preceding year.  Tr. 387, 413.  Plaintiff did not complete the program; citing "pain and

fatigue" to explain one absence and "family commitments" to explain two others, she attended

three of six scheduled days and was discharged because she was "unable to attend regularly."

Tr. 387.  The record does not reflect that Plaintiff sought further intensive mental health

treatment.

### B.    Opinion Evidence

The first opinion comes from Dr. DeSantis, the treating psychologist who submitted no

treating notes.  Dated September 18, 2013, it was written nine months after onset and four

months after the filing of Plaintiff's DIB application.  Tr. 327-30.  Part of the opinion is written

on a form labeled "Substance Abuse Materiality Questionnaire," which opines that Plaintiff has

"major depression that prevents her from functioning in all aspects of her life" and "impacts her

relationships, thinking, behavior, and coping skills."  Tr. 327.  Noting that "Nicole presents as

hopeless," Dr. DeSantis wrote that "[s]he has difficulties with thinking clearly, memory,

concentration, & sustaining attention."  Tr. 327.  Inconsistent with anything else in this record,

Dr. DeSantis wrote that "[s]he uses substances as a way to cope with her depression"[4] and

concluded that "cognitive and behavioral impairments affect her ability to hold and sustain a

job."  Tr. 327-28.  In the RFC portion of her opinion, Dr. DeSantis recorded moderately severe to

severe limitations in every area of mental functioning.  Tr. 329-30.  Dr. DeSantis provides no

information about the basis for her opinion, including how often she observed Plaintiff or

whether she relied on any testing or other clinical diagnostic techniques, particularly with respect

---

[4] Apart from Dr. DeSantis's opinion, there is no suggestion that Plaintiff was abusing either prescribed medication or street drugs.  To the contrary, Dr. Salisbury's notes reflect that he increased Plaintiff's opioid dose during fibromyalgia flares and reduced it when they resolved.  Tr. 283 ("temporarily increase her opiates" to help alleviate pain"); Tr. 338 ("She has weaned down on opiate dose and is now taking 15 mg").  He counseled her on the importance of tapering down and there is no suggestion that she did not accept his recommendations.  See, e.g., Tr. Tr. 285 ("encouraged . . . to taper opiates").  Plaintiff herself denied drug or alcohol abuse or dependence in her clinical interview with Dr. Unger, who performed a consulting examination.  Tr. 346.

to the "cognitive and behavioral impairments," except for the telling admission that she was not even sure what medications Plaintiff was taking. Tr. 330. While Dr. DeSantis checked "yes" to the question whether a psychological evaluation had been performed, the only one in the record was not done until March 2014, six months after Dr. DeSantis signed her opinion. See Tr. 409-14 (Butler Hospital "Initial Psychiatric Evaluation").

The next opinion is based on a consultative examination performed on September 25, 2013, by Social Security Administration ("SSA") consulting rheumatologist, Dr. J. Scott Toder. Tr. 332. Plaintiff told him that she was being followed for depression by a psychiatrist; she also reported that she had been diagnosed with fibromyalgia at the age of twenty-six. Tr. 332. On examination, Dr. Toder confirmed the diagnosis of fibromyalgia, but observed no evidence of swollen, warm or erythematous joints but rather found normal gait, normal strength, normal reflexes and full range of motion in all joints, with slight discomfort in knees and shoulders and "[l]umbar flexion decreased 20% with the patient noting low back discomfort." Tr. 332.

On October 23, 2013, SSA consultant physician Dr. Kenneth Nanian, reviewed the record, including Dr. Toder's report; he opined that fibromyalgia was a severe impairment and concluded that Plaintiff could lift up to ten pounds and occasionally up to twenty pounds, could sit, stand or walk for six hours in an eight-hour workday, could occasionally perform postural activities but must avoid extreme temperatures, humidity, vibration, pulmonary irritants and workplace hazards. Tr. 113-15. Shortly after Dr. Nanian's opinion was signed, Plaintiff's claim was denied initially.[5] Tr. 108.

During the reconsideration phase, the treating nurse, Nurse Hickey, submitted an RFC signed on January 15, 2014. Tr. 381-83. In it, he acknowledged that no psychological

---

[5] The file was also reviewed initially by SSA psychologist Dr. Jeffrey Hughes. Tr. 113. He did not complete an opinion because Plaintiff failed to attend a scheduled psychological consulting examination despite repeated efforts by SSA staff to schedule it at a time convenient for her. Tr. 116-17.

evaluation had been obtained but opined that Plaintiff's mental impairments caused moderately severe to severe impairment in every area of mental functioning. Tr. 381-82. He also filled in a "Substance Abuse Materiality Questionnaire," in which he noted diagnoses of major depression, generalized anxiety disorder and "chronic pain fibromyalgia." Tr. 383. For "objective findings," he cited poor sleep, social anxiety, very depressed mood, low energy and poor concentration, but provided no information regarding whether those "findings" had been based on Plaintiff's subjective report or on his own clinical testing and observation. Tr. 383. He left blank the answer to how pain affected Plaintiff's ability to function. Tr. 382.

On March 5, 2014, Plaintiff finally[6] attended a consultative examination with SSA psychologist Dr. William Unger. Tr. 345. Dr. Unger noted his observations that she exhibited fair hygiene, had a normal gait and made adequate eye contact. Tr. 345. During the clinical interview, Plaintiff told Dr. Unger that she had been treating for "psychiatric services with Brian Hickey, M.D. during the past six months," that she has trouble sleeping, relies on her husband for household chores, maintains a driver's license and enjoys reading, watching television, listening to music, playing games with her granddaughter and occasionally talking to friends, although she also reported that she isolates herself. Tr. 346-47. During the clinical interview, she said that she experiences auditory and tactile hallucinations.[7] Tr. 348. Dr. Unger's clinical testing and observations resulted in findings of adequate task persistence, insight, judgment, attention and concentration; he noted poor short-term memory but grossly intact long-term

---

[6] See n.5 supra.

[7] Plaintiff's report of hallucinations to Dr. Unger appears to be the first suggestion of such a serious symptom that appears in this record. For example, Dr. Salisbury's note from January 23, 2013, states, "no delusions or hallucinations." Tr. 293; see also Tr. 377 (Dr. L'Europa's detailed mental status examination of May 23, 3011, includes no reference to hallucinations or delusions). Shortly after her examination by Dr. Unger, Plaintiff reported this symptom to Nurse Hickey and to staff at Butler Hospital. Tr. 392 (Nurse Hickey's note of March 18, 2014, records, "hearing a voice calling my name"); Tr. 384 (Butler intake history includes report of visual hallucinations two to three times per week and tactile hallucinations daily). Nevertheless, Butler's discharge diagnosis was "major depressive disorder, recurrent, without psychotic features." Tr. 387.

memory.  Tr. 347-48.  He diagnosed "major depressive disorder, recurrent with mood congruent

psychotic features" and assessed a GAF score of "46 now" and "48 during the previous year."[8]

Tr. 349.  By contrast with Nurse Hickey, who diagnosed anxiety but is not an acceptable medical

source,[9] Dr. Unger opined that Plaintiff did not display symptoms consistent with anxiety

disorder.  Tr. 349.

  The reconsideration file reviews were performed by SSA psychologist Dr. Clifford

Gordon and SSA physician Dr. Navjeet Singh.  Dr. Gordon provided his analysis on March 24,

2014, opining that Plaintiff has a severe affective disorder that moderately limits her activities of

daily living, social functioning, and concentration, persistence, and pace, but that she has had no

episodes of decompensation of extended duration.  Tr. 125.  Based on his findings, he opined

that Plaintiff could understand, remember and attend to simple, routine, repetitive, familiar basic

tasks, could complete these tasks in two-hour blocks, could relate to coworkers and supervisors if

contact was minimal and superficial, but could not work with the public and could follow

through on basic tasks and adapt to ordinary changes.  Tr. 128-29.  On April 2, 2014, Dr. Singh

opined that fibromyalgia is a severe impairment; based on this impairment, he concluded that

Plaintiff could lift up to ten pounds, and occasionally up to twenty pounds, could stand or walk

for four hours in an eight-hour workday and sit for six hours in an eight-hour workday, could

occasionally perform postural activities but must avoid concentrated exposure to extreme

temperatures, wetness, humidity, vibration, pulmonary irritants and workplace hazards.  Tr. 124,

126-27.

---

[8] See n.3 *supra*.

[9] Only an acceptable medical source may provide a medical opinion entitled to controlling weight to establish the existence of a medically determinable impairment.  SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006).  A nurse is not an "acceptable medical source" and cannot establish the existence of a medically determinable impairment, although such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function.  Id. at *2-3.

### C.      Plaintiff's Statements

In a June 2013 Pain Questionnaire, Plaintiff wrote that she tries to walk a mile a day but there are days when she cannot get out of bed due to pain that (as of then) had been debilitating for approximately six months.  Tr. 231-32.  In her first Function Report, dated in June 2013 Plaintiff stated that she does stretching exercises, basic cleaning and straightening of the house, tries to take a walk, prepares simple meals, picks up her son, drives, shops and attends church two-to-three times a month.  Tr. 234-37.  She reported no trouble with personal care, though she did report difficulty with lifting, squatting, bending, standing, walking, kneeling, climbing stairs, memory, completing tasks, concentrating, using her hands and getting along with others.  Tr. 234-38.  The second Function Report was prepared seven months later.  In it, Plaintiff reported that it was so painful and difficult to bathe that her husband sometimes assisted.  Tr. 257.  She did housework when she was able, could walk up one flight of stairs, drove short distances, shopped in stores and by computer, spent time watching television "all the time" and socialized with a friend.  Tr. 258-61.  She reported problems with lifting, squatting, bending, standing, reaching, walking, kneeling, talking, climbing stairs, memory, completing tasks, concentrating, understanding, following instructions, using her hands and getting along with others.  Tr. 261.

At the September 2, 2014, hearing, Plaintiff testified that she was living with her sixteen-year-old son and had recently been hired to work four hours a week developing an adult education program for the Cranston school department that she would teach upon its completion.  Tr. 45-46.  She said that this part-time job was a struggle – unable to work four hours on one day, she worked two hours on two days and in the past month had missed two days of work.  Tr. 62.  She claimed that her health problems affect her memory and concentration so that, while she had been working full time, she made mistakes and was frequently late or out sick.  Tr. 50-53.

Since she stopped working, she spends her days lying in her room and watching television, though she interacts with her son when he comes home from school.  Tr. 56.  Nevertheless, she also testified that she loads the dishwasher, sometimes sweeps, does laundry, grocery shops with her son's help and still drives (but has no car).  Tr. 57-59.  She claimed that she can lift no more than five to eight pounds, walk for no more than forty minutes and sit for only ten to fifteen minutes before needing to move; she also alleged that she has trouble writing and gripping and experiences constant leg pain.  Tr. 59-60, 66.  Her medications make her dizzy and fatigued, although they reduce the pain, except for occasional flares.  Tr. 61, 66-67.

Regarding her admission that she collected unemployment from the end of her entitlement to TDI until February 2014, Tr. 48, 52, Plaintiff testified that she applied for unemployment after she was "released" following the medical leave from the Katharine Gibbs School because the school's closing meant that there "was no position to go back to."  Tr. 48.  While collecting unemployment, she testified that "I was going to try to go back to work . . . I was actively looking," an effort that ultimately resulted in the offer of the part-time position in the Cranston school department.  Tr. 53.

## II.   Travel of the Case

On May 16, 2013, Plaintiff applied for DIB, Tr. 108, alleging disability beginning January 6, 2013.  Tr. 180.  Plaintiff's application was denied initially, Tr. 108, and on reconsideration.  Tr. 118.  At Plaintiff's request, the ALJ held a hearing on September 2, 2014, at which Plaintiff, represented by an attorney, and an impartial vocational expert testified.  Tr. 39-40.  On September 26, 2014, the ALJ issued his decision finding that Plaintiff was not disabled within the meaning of the Act from her alleged onset date through the date of the decision.  Tr. 19-34.  On March 11, 2015, the Appeals Council denied Plaintiff's request for review, Tr. 1-3,

making the ALJ's decision the Commissioner's final decision subject to judicial review.  42 U.S.C. § 405(g).

### III.    The ALJ's Hearing and Decision

The vocational expert ("VE") confirmed that Plaintiff's past work was light and skilled. Tr. 72-73.  In response to the ALJ's hypothetical, he testified regarding an RFC limited to light work, with standing and walking limited to four hours, occasional postural activities, performing tasks up to several steps, and working occasionally with the public, with occasional interaction with co-workers and supervisors.  Tr. 73-75.  The VE opined that such an individual could not perform Plaintiff's past work but could perform other jobs, including jobs at the sedentary exertional level.  Tr. 74-76.  However, absences of more than once a month and lateness of more than thirty minutes "would be problematic."  Tr. 77.

At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date.  Tr. 24.  At Steps Two and Three, he found two severe impairments, fibromyalgia and depression, but concluded that neither met nor equaled any Listing.  Tr. 25.  In formulating his RFC finding, which tracked the hypothetical to the VE, the ALJ placed substantial weight on the opinions of the SSA physician, Dr. Singh, and the SSA psychologist, Dr. Gordon; he rejected the opinions of Dr. DeSantis and Nurse Hickey, affording them minimal weight, because they were unsupported by the treatment notes on which they were allegedly based, inconsistent with the record and apparently prepared in reliance on Plaintiff's subjective allegations.  Tr. 26, 32.  Based on the RFC, at Steps Four and Five, the ALJ found that Plaintiff could not perform her past work, but that she can do jobs existing in significant numbers in the regional and national economy; he concluded that Plaintiff was not disabled within the meaning of the Act from her alleged onset date through the date of his decision.  Tr. 33-34.

IV.     **Issue Presented**

Plaintiff challenges the ALJ's evaluation of her credibility.

V.      **Standard of Review**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts."  Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  A claimant's

complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).  Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001).  On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After

a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g).  To remand under Sentence Six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level.  See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).  With a Sentence Six remand, the parties must return to the Court after remand to file modified findings of fact.  Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)).  The Court retains jurisdiction pending remand.  Id.

## VI.   <u>**Disability Determination**</u>

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(I); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.   **Treating Physicians and Other Sources**

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise.  See Rohrberg v. Apfel, 26 F.

Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(c).  If a treating physician's opinion

on the nature and severity of a claimant's impairments is well-supported by medically acceptable

clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial

evidence in the record, the ALJ must give it controlling weight.  Konuch v. Astrue, No. 11-193L,

2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 404.1527(c)(2).  The ALJ may

discount a treating physician's opinion or report regarding an inability to work if it is

unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of

Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).  The ALJ's decision must

articulate the weight given, providing "good reasons" for the determination.  See Sargent v.

Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where

ALJ failed to point to evidence to support weight accorded treating source opinion, court will not

speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford

them such weight as is supported by clinical or laboratory findings and other consistent evidence

of a claimant's impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

When a treating physician's opinion does not warrant controlling weight, the ALJ must

nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and

the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical

evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in

the medical conditions at issue; and (6) other factors which tend to support or contradict the

opinion.  20 C.F.R § 404.1527(c).  However, a treating physician's opinion is generally entitled

to more weight than a consulting physician's opinion.  See 20 C.F.R. § 404.1527(c)(2).

A treating source who is not a licensed physician or psychologist[10] is not an "acceptable medical source."  20 C.F.R. § 404.1513; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006). Only an acceptable medical source may provide a medical opinion entitled to controlling weight to establish the existence of a medically determinable impairment.  SSR 06-03p, 2006 WL 2263437, at *2.  An "other source," such as a nurse practitioner or licensed clinical social worker, is not an "acceptable medical source," and cannot establish the existence of a medically determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function.  Id. at *2-3.  In general, an opinion from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist.  Id. at *5.  Nevertheless, the opinions of medical sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects, along with other relevant evidence in the file.  Id. at *4. The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(d).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity ("RFC"), see 20 C.F.R. § 404.1545-1546, or the application of vocational factors because that ultimate determination is the province of the Commissioner.  20 C.F.R. § 404.1527(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

### B.    The Five-Step Evaluation

---

[10] The regulations recognize other categories of providers as acceptable medical sources for certain impairments; for example, a licensed optometrist is acceptable for measurement of visual acuity and visual fields.  SSR 06-03p, 2006 WL 2263437, at *1.

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § 404.1520.  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted.  20 C.F.R. § 404.1520(g).  Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five.  Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993). The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits.  42 U.S.C. § 416(i)(3); Deblois, 686 F.2d at 79.  If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be

denied despite disability.  Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st

Cir. 1986).

### C.        Making Credibility Determinations

When an ALJ decides not to credit a claimant's testimony, the ALJ must articulate

specific and adequate reasons for doing so, or the record must be obvious as to the credibility

finding.  See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986);

Rohrberg, 26 F. Supp. 2d at 309-10.  A reviewing court will not disturb a clearly articulated

credibility finding with substantial supporting evidence.  See Frustaglia, 829 F.2d at 195.  The

lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is

critical to the outcome of the case.  See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir.

1982).  If proof of disability is based on subjective evidence so that the credibility determination

is determinative, "the ALJ must either explicitly discredit such testimony or the implication must

be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562

(11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

### D.        Pain

"Pain can constitute a significant non-exertional impairment." Nguyen, 172 F.3d at 36.

Congress has determined that a claimant will not be considered disabled unless medical and

other evidence (e.g., medical signs and laboratory findings) is furnished showing the existence of

a medical impairment which could reasonably be expected to produce the pain or symptoms

alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about

symptoms, including pain, and determine the extent to which the symptoms can reasonably be

accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In

determining whether the medical signs and laboratory findings show medical impairments which

reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's

six-part pain analysis: (1) the nature, location, onset, duration, frequency, radiation, and intensity

of any pain; (2) precipitating and aggravating factors (e.g., movement, activity, environmental

conditions); (3) type, dosage, effectiveness, and adverse side-effects of any pain medication; (4)

treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the

claimant's daily activities.  Avery, 797 F.2d at 29; Gullon v. Astrue, No. 11-cv-099ML, 2011

WL 6748498, at *5-6 (D.R.I. Nov. 30, 2011).

An individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. §

423(d)(5)(A).  Guidance in assessing the credibility of the claimant's statement regarding the

severity of pain is provided by the Commissioner's 1996 ruling, SSR 96-7p. 1996 WL 374186

(July 2, 1996).  Credibility of an individual's statements about pain or other symptoms and their

functional effects is the degree to which the statement can be believed and accepted as true; in

making this determination, the ALJ must consider the entire case record and may find that all,

only some, or none of an individual's allegations are credible.  Id. at *4.  One strong indication

of the credibility of an individual's statements is their consistency, both internally and with other

information in the record.  Id. at *5-6.

## VII.   **Application and Analysis**

Plaintiff challenges the ALJ's decision by pointing to a list of claimed errors that she

contends cumulatively taint the credibility finding that "little probative weight" should be

afforded to her testimony.  Tr. 31.  Further, although she has not questioned the ALJ's

determination to afford "minimal weight" to the only providers who opined that she has

disabling limitations, Dr. DeSantis and Nurse Hickey, she argues that their opinions constitute

medical evidence corroborating her statements regarding the severity of her mental health

symptoms. Based on these errors, she asks the Court to remand the matter for further

consideration of what she contends is credible testimony that she suffers from pain that is so

distracting and debilitating as to preclude all work.[11]

It has long been recognized that fibromyalgia is a condition that is established primarily

based on the patient's subjective pain, with trigger points the only objective symptom. Johnson

v. Astrue, 597 F.3d 409, 412 (1st Cir. 2009). In Johnson, the Court found error requiring remand

based on the ALJ's erroneous decision to disregard the treating physician's diagnosis of

fibromyalgia based on the lack of objective findings. Id. at 411-13. Johnson emphasizes that

when an ALJ finds that fibromyalgia is a severe impairment, he must "conclude that the claimant

suffer[ed] from the symptoms usually associated with [such condition], unless there was

substantial evidence in the record to support a finding that claimant did not endure a particular

symptom or symptoms." Id. at 414; see SSR 12-2p, 2012 WL 3104869, at *5 (July 25, 2012).

Accordingly, when the impairment is fibromyalgia, the "credibility determination is a vital piece

of the puzzle and therefore critical to the outcome of the case." Charpentier v. Colvin, C.A. No.

12-312 S, 2014 WL 575724, at *16 (D.R.I. Feb. 11, 2014); see Rodriguez v. Colvin, C.A. No.

15-211-M-LDA, slip op. at 8 (with fibromyalgia, credibility determination is critical to outcome

of disability claim).

At the same time, it is equally well settled that neither does a diagnosis of fibromyalgia

translate to a finding of disability nor does it automatically render the claimant's testimony

---

[11] In addition to her argument that her testimony regarding pain and fatigue should have been credited, Plaintiff also mentions in passing that the VE testified that the inability to use the hands for fine manipulation more than occasionally would be work-preclusive, Tr. 77, and that, at the hearing, Plaintiff testified that "one of [her] big problems" is gripping and writing and that she has "no coordination" and is always breaking things. Tr. 66. This somewhat indirect claim of severe manipulation limitations is unsupported by the record; there is no medical opinion supporting a claim that Plaintiff's hands could not be used for fine manipulation. See Tr. 231, 233, 256. To the contrary, Dr. Singh opined that he found no manipulative limitations. Tr. 127. Nor does Plaintiff present any argument why the ALJ should have incorporated manipulative limitations into his RFC. When an argument is not developed, the Court need not struggle to consider it. Coulombe v. Colvin, No. CV 14-491ML, 2016 WL 1068875, at *1 (D.R.I. Feb. 19, 2016).

credible. Mariano v. Colvin, No. 15-018, 2015 WL 9699657, at *11 (D.R.I. Dec. 9, 2015)

(citing cases), adopted, 2016 WL 126744 (D.R.I. Jan. 11, 2016).  In particular, fibromyalgia does

not alter the bedrock principle that the ALJ's credibility determination must be afforded due

deference by the reviewing court as long as it is sufficiently supported by specific findings.  See

Frustaglia, 829 F.2d at 195.  The ALJ is the individual optimally positioned to observe and

assess witness credibility, Mariano, 2015 WL 9699657, at *10, so that "[i]n critiquing the ALJ's

credibility determination, this Court is mindful of the need to tread softly, because "[i]t is the

responsibility of the [Commissioner] to determine issues of credibility and to draw inferences

from the record evidence."  Cruz v. Astrue, No. CA 11-638M, 2013 WL 795063, at *16 (D.R.I.

Feb. 12, 2013), adopted, 2013 WL 802986 (D.R.I. Mar. 4, 2013); Beaudet v. Colvin, No. CA 14-

112 S, 2015 WL 5510915, at *14 (D.R.I. Sept. 16, 2015).

    In this case, the ALJ's credibility finding properly focused on the Avery factors and is

detailed and amply footed in the record; it extends over four pages with extensive citation to the

exhibits and to Plaintiff's statements.  Tr. 28-32.  It relies principally on the ALJ's determination

that the medical evidence does not support Plaintiff's allegations as to the severity and limiting

effects of fibromyalgia, the inconsistency between her testimony and her daily living activities

and the absence of objective medical evidence of disabling limitations, including disabling

deficits in cognitive and behavioral functioning.  Tr. 29-30.  Beneath this credibility analysis

lurks the reality that there are no competent medical opinions buttressing Plaintiff's claims,

except for the discredited RFCs prepared by Dr. DeSantis and Nurse Hickey.

    Turning first to the physical effects of fibromyalgia, the ALJ's decision has no Johnson

error – to the contrary, it accepted both the diagnosis of fibromyalgia and that fibromyalgia has

caused Plaintiff to experience pain with periodic flares that repeatedly required adjustments in

her medication.  Tr. 29.  From that foundation, the ALJ scoured the record for objective evidence to confirm the severe limitations that Plaintiff claimed were caused by the pain.  See Rodriguez, C.A. No. 15-211-M-LDA, slip op. at 7-8 (D.R.I. Mar. 17, 2016) (error to base adverse credibility finding on lack of objective evidence of pain when medical records reflected many injections during period when pain at its apex).  In doing so, the ALJ carefully examined Dr. Salisbury's treating notes and Dr. Toder's examining report; for his findings regarding the limiting effects caused by the symptoms described in those records, the ALJ relied on the SSA reviewing physician, Dr. Singh.  Tr. 27, 32.

Cumulatively, this evidence is more than sufficient to support the ALJ's finding that the medical record does not support the extreme physical limitations Plaintiff claimed in her testimony.  For example, at the appointments before and immediately following Plaintiff's "medical leave," Tr. 48, beginning on January 6, 2013, Dr. Salisbury's notes do not reflect that he recommended that she stop working; rather, on January 23, 2013, he wrote only that she had had "some trouble with flare of fibromyalgia pain" and that she would be "OOW for another month." Tr. 293.  At the next appointment, Dr. Salisbury's note confirms that she was not working because "she believes that she is not yet ready to return," not based on his advice.  Tr. 291.  By the third month after she had stopped work, Dr. Salisbury wrote that he had "[d]iscussed making a plan to resume work as she has been out for a long time." Tr. 289.  These references readily support the inference drawn by the ALJ that Dr. Salisbury felt Plaintiff was capable of work.  See Tr. 29.  Plaintiff's interpretation – that Dr. Salisbury meant making a plan to work in some unknown future time – is belied by the context.

The ALJ's credibility finding is further substantiated by the largely normal findings made by Dr. Salisbury on physical examination.  E.g., Tr. 285 (no acute distress; neck: supple, non-

tender, full range of motion; back: no cva tenderness).  And when a physical examination did

result in a finding ("sig pain with exam consistent with her fibro with addition irritation from the

edema"), Dr. Salisbury treated the pain by stopping one medication and prescribing a new one;

as Plaintiff testified, this resolved the swelling.  Tr. 66, 396.  The ALJ was also right in finding

that Dr. Salisbury's notes reflect largely conservative treatment for her physical symptoms, with

"good overall effect" from prescribed medication.  Tr. 338.  Even when his notes refer to pain

flares, they often are associated either with a precipitating incident or with the failure to take

prescribed medication, and consistently are treated with, at most, an adjustment in medication.

See, e.g., Tr. 283 (pain flare after back wrenched from carrying laundry basket upstairs treated

with temporary increase in opiates); Tr. 289 (pain flare in arms and hands treated with

continuation of prescribed medication with opiates for any breakthrough); Tr. 336 (whiplash

from car accident causes pain flare; no change in medication).  Plaintiff herself confirmed that

her prescribed medication had eased pain that had made her "almost bedridden" when she was

first diagnosed at the age of twenty-six.  Tr. 67 ("It . . . gets me up a little bit").  Moreover, her

testimony that "I do get a lot of side effects with the medications . . . [d]izziness, light-

headedness," Tr. 61, contrasts with Dr. Salisbury's many notations about the absence of

significant side effects.  E.g., Tr. 285 ("no sig sedation or constipation"); Tr. 338 ("no sig

constipation or sedation").

     The physical examination performed by SSA rheumatologist Dr. Toder is additional

evidence supporting the ALJ's credibility finding – Dr. Toder confirmed the diagnosis of

fibromyalgia, but also concluded that Plaintiff exhibited normal gait, reflexes and strength, full

range of motion of all joints, with only slight discomfort in her knees and shoulders and no

swelling or warmth in any joints.  Tr. 332.  Importantly, no qualified medical professional

disagreed with these observations in that there is no opinion that Plaintiff's pain resulted in physical limitations consistent with her statements.

The second leg of the ALJ's credibility finding focused on Plaintiff's activities of daily living.  Tr. 31.  In her various pre-hearing statements, Plaintiff reported that she could straighten up the house, prepare simple meals, deal with personal care, drive, shop and attend church several times a month.  Tr. 231-32, 234-37, 258-60.  In her first Function Report, she said she tried to walk a mile daily.  Tr. 232.  She told Dr. Unger that she enjoyed reading, watching television, listening to music, playing games with her granddaughter and occasionally talking to friends.  Tr. 347.  She told Dr. Salisbury that she was "carrying a laundry basket up the steps," when she wrenched her back.  Tr. 283.  While these activities may not be proof of the ability to perform competitive work, they are plainly inconsistent with Plaintiff's hearing testimony that she is "just sick all the time" and there are days when she "can't get out of bed," she cannot lift more than five to eight pounds and she cannot sit and read.  Tr. 50, 54, 58-59.  See Mariano, 2015 WL 9699657, at *11 (evidence that plaintiff did light chores, drove, managed her money, watched television, used a computer and had friends undermined her claim of disabling fibromyalgia); see also SSR 96-7p, 1996 WL 374186, at *5 ("[o]ne strong indication of an individual's statements is their consistency, both internally and with other information in the case record").

The final leg of the ALJ's credibility finding focuses on Plaintiff's mental health limitations and their impact on her ability to sustain gainful employment.  Tr. 30.  Here the analysis is somewhat more complex – by contrast with the record relating to physical limitations, Plaintiff argues that the credibility of her claim of disabling mental limitations is corroborated by

the two treating opinions (Dr. DeSantis and Nurse Hickey) that itemize disabling limitations. Yet (with good reason) she has not challenged the ALJ's decision to afford them little weight.

First, by not challenging it, Plaintiff has waived any objection to the ALJ's finding regarding the weight to give to the opinions of Dr. DeSantis and Nurse Hickey. Riendeau v. Astrue, No. 09-149 ML, 2010 WL 1490817, at *3 n.6 (D.R.I. Mar. 12, 2010) (arguments not raised are waived), adopted, 2010 WL 1486499 (D.R.I. Apr. 13, 2010). Even if she had not waived, the ALJ's rejection of both is amply supported by the complete absence of any evidence of clinical testing or observation to support extreme opinions that are not consistent with the other medical evidence; for example, Dr. DeSantis's conclusions that serious "cognitive & behavioral impairments affect her ability to hold onto & sustain a job" and that "she uses substances as a way to cope" are both unsupported and inconsistent with other evidence in the record. Compare Tr. 327-28, with Tr. 385 (memory and intellectual functioning normal), and Tr. 346 ("denied a personal history of drug or alcohol abuse or dependence"). I find no error in the ALJ's conclusion that these opinions appear to be based on Plaintiff's subjective statements. They do not call into question the viability of the ALJ's credibility finding.

The ALJ's rejection of Plaintiff's claim of extreme mental limitations is supported by the report of Dr. Unger, who performed a clinical interview and a mental status examination and found Plaintiff's concentration and task persistence adequate and long-term memory grossly intact; he found only her short-term memory to be poor. Tr. 348. It is also supported by the few mental status evaluations performed by Dr. Salisbury, the treating provider with the longest relationship with Plaintiff, which were largely normal. Tr. 291-93. Similarly, on admission to and discharge from Butler Hospital, Plaintiff was able to attend interviews and showed normal memory and intellectual functioning and adequate insight and judgment; at discharge, her prior-

28

year GAF was assessed at 60, which reflects moderate symptoms.[12]  Tr. 385-87.  All of this

evidence was reviewed by the SSA psychologist, Dr. Gordon, who opined to moderate mental

limitations.  Tr. 125, 128.  The non-exertional limits in the ALJ's RFC were properly based on

Dr. Gordon's opinion.

In examining Plaintiff's credibility, it was also appropriate for the ALJ to consider

Plaintiff's failure to attend the Butler Hospital program to the point where she was discharged for

nonattendance, as well as her apparent abandonment of counseling with Dr. DeSantis after only

six appointments.  See Mariano, 2015 WL 9699657, at *11 ("It is well settled that an ALJ may

infer that symptoms are not as severe as alleged when the claimant declines treatment to address

them.").  In light of the ALJ's express consideration of Plaintiff's stated reasons for the failure to

pursue treatment, Tr. 30, this Court need not linger over Plaintiff's argument that the ALJ erred

in failing to explore further her reasons for abandoning more intensive mental health treatment,

particularly where Plaintiff has not proffered any information regarding what would have been

uncovered if the ALJ had continued to press for a further explanation.  This is not a case where

the adverse credibility finding was wrongly based on the failure to pursue treatment without

mention of the claimant's reasons.  See Beaudet, 2015 WL 5510915, at *15-16 (ALJ's failure to

mention claimant's reasons for refusal of treatment other than what had worked in the past

precludes reliance on refusal of treatment to support adverse credibility determination).

Finally, there is no error in the ALJ's conclusion that Plaintiff's recent hiring by the

Cranston school department to develop an educational program is inconsistent with her claim of

serious cognitive deficits.  Tr. 29, 31.  Without speculating whether Plaintiff will succeed in this

---

[12] The ALJ properly noted that the other GAF scores in the record – 46 assessed by Dr. Unger and 40/50 assessed by the Butler staff at intake and discharge respectively – "can be based upon subjective, unsubstantiated complaints" of the claimant  Tr. 30 n.2.  The GAF score's lack of reliability as an assessment tool is why it was discontinued by the America Psychiatric Association in 2013.  Id.; see also n.3 supra.

endeavor, the ALJ certainly could infer that the mere fact that Plaintiff was hired to perform such a task is inconsistent with her testimony regarding disabling cognitive deficits.  Tr. 29, 31; see Bourinot v. Colvin, 95 F. Supp. 3d 161, 181 (D. Mass. 2015) (finding the fact that the claimant had been hired for jobs while claiming to be unable to work supportive of a negative credibility assessment even where those jobs did not work out).

Based on this detailed analysis of the ALJ's reasoning, I find that there is robust support for the ALJ's credibility finding.  See Da Rosa, 803 F.2d at 26 (ALJ must make specific findings on relevant evidence considered to disbelieve claimant).  Nevertheless, this analysis does not conclude Plaintiff's long list of errors.  Several of her arrows hit the mark.  I turn to them next.

First, the ALJ unquestionably erred in relying on a record that was placed in this file by mistake (it relates to a different person).  Tr. 29, 380.  Because the ALJ was never alerted to the mistake (which was not discovered until the document was removed by the Appeals Council), the ALJ plainly erred in relying on it as one small fact supporting his credibility finding.  Similarly, as the Commissioner concedes, the ALJ's reliance on Plaintiff's work history from age twenty-six, when fibromyalgia was diagnosed, until January 2013, when she stopped working, is misplaced in that prior work does not undermine the credibility of her claim that her impairments worsened at onset.  Tr. 29.  Nor does the fact that she was not actively being treated by a rheumatologist constitute evidence undermining her credibility.  Tr. 29.

A more substantive question is presented by the ALJ's decision to base, in part, his negative credibility finding on Plaintiff's application for unemployment benefits.  Tr. 31.  There is no doubt that there is a conceptual inconsistency between an application for disability benefits and an application for unemployment, which requires that the applicant is able to work.  See Rhode Island Temps, Inc. v. Dep't of Labor & Training Bd. of Review, 749 A.2d 1121, 1126

(R.I. 2000) ("suitable work" in unemployment statute means "any work which is within that individual's capabilities"). Based on this inconsistency, some cases accept the receipt of unemployment as *per se* substantial evidence supporting an adverse credibility finding. Bowden v. Astrue, No. 11-84, 2012 WL 1999469, at *11 (D.R.I. June 4, 2012). In light of the First Circuit's "reservations about the significance of such evidence," Perez v. Sec'y of Health, Educ. & Welfare, 622 F.2d 1, 3 (1st Cir. 1980), other cases deploy a more nuanced analysis. See, e.g., Ziobrowski v. Colvin, C.A. No. 14-549-M, 2015 WL 5546727, at *10 (D.R.I. Sept. 18, 2015) (with no evidence in support of unemployment claim that contradicts disability application, error to rely on unemployment as substantial evidence of lack of credibility); Choquette v. Astrue, No. C.A. 08-384A, 2009 WL 2843334, at *11 (D.R.I. Aug. 31, 2009) (with no discrepancy between what claimant told Department of Labor & Training and sworn statement in disability application, unemployment does not support adverse credibility finding). Here, Plaintiff testified that, after her medical leave from the Katherine Gibbs School ended, she was willing to "try to go back to work" and was "seeing how it goes." Tr. 53. While the ALJ could certainly draw an adverse credibility inference from the inconsistency between this testimony and many of her other statements, such as her testimony that she spends her days in bed, it is insufficient to buttress the *per se* conclusion that Plaintiff's acceptance of unemployment, standing alone, is enough to support an adverse credibility inference. Accordingly, I find that this record was insufficiently developed to supply substantial support for the ALJ's conclusion that Plaintiff's receipt of unemployment benefits was inconsistent with her allegations of disability.

With a well-grounded adverse credibility finding, yet a collection of errors also in the mix, the final task is to consider whether these errors so tainted the ALJ's credibility analysis as to require remand for a do-over. See Beaudet, 2015 WL 5510915, at *16. I find that they do

not.  The ALJ's credibility finding is still adequately supported by substantial evidence when these erroneous findings are disregarded.  <u>Perez</u>, 622 F.2d at 3 (despite potential error in reliance on unemployment, denial of benefits affirmed because it was not "a decisive factor" in ALJ's decision); <u>Beaudet</u>, 2015 WL 5510915, at *16-17 (when ALJ's credibility finding is neither "terse nor sparse," it properly rests on other substantial evidence, even after exclusion of erroneous grounds).  Accordingly, I recommend that this Court affirm the ALJ's decision.

## VIII.  <u>Conclusion</u>

Based on the foregoing analysis, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 13) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 14) be GRANTED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  <u>See</u> Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  <u>See</u> <u>United States v. Lugo Guerrero</u>, 524 F.3d 5, 14 (1st Cir. 2008); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
April 29, 2016